# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **MICHAEL WILLIAMS AND** * | |
| **MARCO WILLIAMS,** * | |
| **d/b/a FIRST CHOICE VIDEO** * | |
| * | |
| **PLAINTIFFS,** * | |
| * | **Case No.:  1:07-cv-228-MEF** |
| **VS.** * | |
| * | |
| **MGA, Inc., and all Holding** * | |
| **Companies and affiliated** * | |
| **Entities, d/b/a** * | |
| **MOVIE GALLERY,** * | |
| **UNITED PARCEL SERVICE,** * | |
| **INC.,(UPS), SELECT MEDIA** * | |
| **SERVICES, LLC, MILE HIGH** * | |
| **MEDIA, INC., LFP, INC.,** * | |
| **DIGITAL SIN, INC., and** * | |
| **FRASERSIDE HOLDING,** * | |
| **LTD,** * | |
| * | |
| **DEFENDANTS.** * | |

## ANSWER TO MOTION TO DISMISS BY DEFENDANT MOVIE GALLERY US, LLC

Come now Plaintiffs, Michael Williams and Marco Williams, and in response to the Defendant's Motion to Dismiss, says as follows:

### A

All Pleadings in Federal Practice are governed by Rule 8 FRCP which requires that a Complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief.  This is called "Notice Pleading."  Fifty years ago in <u>Conley v. Gibson,</u> 355 U.S. 41

(1957) the U.S. Supreme Court spelled out these requirements and it has re-affirmed them since then at various times. (See <u>Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit</u>, 507 U.S. 163 (1993); <u>Crawford-El v. Britton</u>, 523 U.S. 574 (1988) and <u>Swierkiewicg v. Sorema</u>, N.A., 534 U.S. 506 (2002)).  (See, also, Exhibit 1)

The Defendant seeks to engraph Rule 9's dictates regarding fraud allegations.  That is not permissible and obviously deserves rejection by this Court.  The Complaint here more than provides adequate notice to the Defendant what it is called upon to defend.

<u>B</u>
<u>CIVIL RICO CLAIMS</u>

This Defendant has two positions underlying why the Complaint is due to be dismissed under 12 (b) (6).  When examined, only one amounts to an argument that merits addressing.  But in the interest of clarity, Plaintiff will briefly articulate why this Defendant's first position does not command much attention.  MGA argues that the Complaint "is grossly insufficient as a matter of Law.  Plaintiff must set forth facts with proper specificity establishing that a violation of 18 U.S.C. Section 1962 has occurred".   Defendant then cites the case of <u>James v. Meow Media,</u> 90 F. Supp. 2d 798 (W.D. Ky. 2000), affirmed, 300 F. 3d 683. (6th Cir., 2002).

The District Court in <u>James</u> was confronted with basically a negligence case in Federal Court.  The underlying facts were that the parents of murdered schoolchildren sued the makers of violent videogames accessed through the Internet by their killer.  Among other problems, the Plaintiffs there had no standing under RICO as they had no injury to property or business.  Moreover, the Court held that while the Plaintiffs alleged predicate acts, they had failed to identify an organization that had been corrupted.  <u>James</u>, supra, p. 688-689, (6th Cir., 2002).

The Complaint alleges more than two predicate acts; it alleges thousands under Section 1962.  Plaintiffs allege violations of Section 1962 (c) and (d).

<u>C</u>
<u>CIVIL RICO CLAIMS AS MATTER OF LAW</u>

Next, this Defendant contends that Plaintiff's Complaint must fail as it does not, and cannot, establish the elements of a Civil RICO claim as a matter of Law. In response, Plaintiff would direct the Court to the recent decision of our Circuit Court again outlining the elements of RICO Conspiracy and RICO Enterprise.

In <u>United States v. Pipkins</u>, 378 F.3d 1281 (11th Cir., 2004), Judge Cox's majority opinion regarding conspiracy held that,

> "to establish a RICO conspiracy, the Government had to prove that the Defendants "objectively manifested, through words or actions, an agreement to participate in ... the affairs of [an] enterprise through the commission of two or more predicate acts." <u>United States v. To</u>, 144 F.3d 737, 744 (11th Cir. 1998) (internal quotations and citations omitted). Specifically, the Defendants must have agreed to participate in (1) an enterprise; (2) that was engaged in or affected interstate commerce; and (3) that engaged in a pattern of racketeering activity. 18 U.S.C. Section 1962 (c) and (d); <u>United States v. Starrett</u>, 55 F.3d 1525, 1542 (11th Cir. 1995).

On the question of a RICO Enterprise, Judge Cox wrote:

> "The Defendants contend that the evidence at trial was insufficient to prove the existence of a RICO enterprise. "A jury is entitled to infer the existence of an enterprise on the basis of largely or wholly circumstantial evidence ... [D]irect evidence of association may be difficult to obtain; a jury [is] permitted to draw the natural inference arising from circumstantial evidence of association." <u>United States v. Elliot</u>, 571 F.2d 880, 898 (5th Cir. 1978).

> Under RICO, an "enterprise" "[i]ncludes any individual, partnership, corporation, association, or other

legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. Section 1961 (4). An enterprise can consist of "a group of persons associated together for a common purpose of engaging in a course of conduct ... proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981).

"[A]n enterprise can exist in the absence of a formally structured group," United States v. Young, 906 F.2d 615, 619 (11th Cir. 1990), which can be even "a myriopod criminal network, loosely connected but connected nonetheless." Elliot, 571 F.2d at 898. We have held that there is no difference, for enterprise purposes, between a duly elected corporate board and an "amoeba-like infra-structure" in control of criminal activity. [FN4] See id.; United States v. Lignarolo, 770 F.2d 971, 979 n.12 (11th Cir. 1985).

3

FN4. We have also accepted the analogy that an enterprise could be as amorphous as a "pick-up" basketball game. United States v. Valera, 845 F.2d 923 (11th Cir. 1998). In Valera, the defendant in a drug smuggling operation challenged his RICO conviction, arguing that the drug shipment offloads were discrete conspiracies formed only to accomplish a specific mission rather than a RICO enterprise. Id. At 929. We rejected the defendant's argument, as the evidence showed that the enterprise constituted of a core group of players, with others that would "sub-in" as needed for each shipment. Id. We concluded that "[w]hile there were many ventures or individual conspiracies, there was also one enterprise, one common purpose, and one over-arching conspiracy." Id.

The Government invites us to hold that he evidence showed that all of the pimps charged in this indictment

constituted a RICO enterprise.  The Defendants, on the other hand, invite us to hold that their convictions cannot stand unless the evidence showed that all of these indicated southwest Atlanta pimp constituted a RICO enterprise. [FN5]  We decline both invitations, and address a more narrow question: whether the evidence supports a finding that the Defendants agreed to participate in any RICO enterprise--whether or not the enterprise included all these southwest Atlanta pimps.

FN5.  More specifically, the Defendants argue that these Atlanta pimps were not a RICO enterprise because they did not have any organization, hierarchy, or leader (e.g., a "head pimp") that supervised pimping activities. Furthermore, the Defendants argue, even though pimps interacted as necessary to facilitate the "choosing" and "serving" of the prostitutes, the pimps were actually direct competitors in a fierce market.  About the fact that competing prostitutes often charged identical prices for dates, the Defendants analogize to corner gas stations, explaining that this was due to conscious parallelism. Finally, the Defendants contend that these pimps did not form a RICO enterprise because they did not have continuity of membership or an outer boundary that prevented outsiders from joining and leaving the group at will.

The court's instructions to the jury correctly summarized the definition of a RICO enterprise:  The term "enterprise" includes any partnership, corporation, association or other legal entity or any union or group of individuals associated in fact although not a legal entity. An association in fact enterprise may consist of a group of persons associated together for a common purpose of engaging in a court of conduct.  The Government must prove the existence of such an enterprise by evidence of an ongoing organization, formal or informal, and by evidence that the various associates functioned as a continuing unit. So it is – an enterprise is – in this case is people associated

in fact together for a common purpose of engaging in a course of conduct that has a continuity to it.  It's ongoing. (R.24 at 1885.)"

And with respect to the question of continuity, Plaintiffs are prepared to show that at least since 1999, these Defendants have been operating their RICO enterprise by using their own records which include internal memoranda, e-mails and eyewitnesses (See Exhibit "A").  Plaintiffs were direct, if overmatched, competitors of Defendant MGA.  When one actor in an industry or field gains an illegal competitive advantage, the first injury is always to the others in that industry.  It is not remote or speculative but direct and palpable. Defendant MGA's distribution of obscenity was not haphazard or slipshod, but a fully integrated, object-driven operation, which used the other Defendants' product or service to gain profit from criminal violations.

While adherence to Rule 8 both opens and closes any discussion surrounding Defendant's Motion, Plaintiffs do wish to address the apparent gap in Defendant's understanding that dealing in obscene material is racketeering activity.  If the plain meaning to be taken from 18 U.S.C. Section 1961 wherein Congress said "racketeering activity" means [....] dealing in obscene matter [....], further evidence can be found from recent criminal prosecutions by the U.S. Department of Justice. (Exhibits 2 – 6).

## CONCLUSIONS

The Defendant clearly believes that having profited from crime for so long without prosecution that it has a right, or is entitled to continue to profit from that crime despite the injury to legitimate retailers like Plaintiffs.  All of the parsing of plain language won't change the fact that this Defendant knows precisely why it's being sued and from what it has to defend.  That's all Rule 8 requires and to suggest any result other than the denial of Defendant's Motion is dishonesty at best and a desecration of Law at worst, inviting chaos in so many ways.

Malcolm R. Newman, Attorney, P.C.

/s/  Malcolm R. Newman
Malcolm R. Newman (NEW017)
Attorney for the Plaintiff
P.O. Box 6137
Dothan, Alabama 36302
(334) 792-2132
ASB-2826-M39M

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2007, I have filed a copy of the foregoing with the clerk of the court via the CM/ECF system which will send notification of such filing to the following:

Jeffrey Grantham
Maynard, Cooper & Gale, P.C.
1901 Sixth Avenue North
2400 AmSouth Harbert Plaza
Birmingham, Alabama 35203-2618

Jeff Lee
Maynard, Cooper & Gale, P.C.
1901 Sixth Avenue North
2400 AmSouth Harbert Plaza
Birmingham, Alabama 35203-2618

John Thomas A. Malatesta, III
Maynard, Cooper & Gale, P.C.
1901 Sixth Avenue North
2400 AmSouth Harbert Plaza
Birmingham, Alabama 35203-2618

/s/ Malcolm R. Newman

Exhibit 1

**CONLEY v. GIBSON**
355 U.S. 41
Case Number: 7
Case Number: 7
Decided: 10/21/1957
United States Supreme Court

Cite as: 1957 US, 355 U.S. 41, __ __

# U.S. Supreme Court

## CONLEY v. GIBSON, 355 U.S. 41 (1957)

### 355 U.S. 41

CONLEY ET AL. v. GIBSON ET AL.
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT.
No. 7.
Argued October 21, 1957.
Decided November 18, 1957.

Petitioners, who are Negro members of a union designated as their bargaining agent under the Railway Labor Act, brought a class suit against the union, its brotherhood and certain of their officers to compel them to represent petitioners without discrimination in protection of their employment and seniority rights under a contract between the union and the Railroad. They alleged that the Railroad had purported to abolish 45 jobs held by petitioners and other Negroes but had employed whites in the same jobs (except in a few instances in which it had rehired Negroes to fill their old jobs with loss of seniority) and that, despite repeated pleas, the union had done nothing to protect petitioners from such discriminatory discharges. The District Court dismissed the suit on the ground that the National Railroad Adjustment Board had exclusive jurisdiction over the controversy. The Court of Appeals affirmed. Held:

    1. It was error to dismiss the complaint for want of jurisdiction. Section 3 First (i) of the Railway Labor Act confers upon the Adjustment Board exclusive jurisdiction only over "disputes between an employee or group of employees and a carrier or carriers," whereas this is a suit by employees against their bargaining agent to enforce their statutory right not to be discriminated against by it in bargaining. Pp. 44-45.

    2. The Railroad was not an indispensable party to this suit, and failure to join it was not a ground for dismissing the suit. P. 45.

    3. The complaint adequately set forth a claim upon which relief could be granted. Pp. 45-48.

    (a) The fact that, under the Railway Labor Act, aggrieved employees can file their own grievances with the Adjustment Board or sue the employer for breach of contract is no justification for the union's alleged discrimination in refusing to represent petitioners. P. 47.

    (b) Failure of the complaint to set forth specific facts to support its general allegations of discrimination was not a sufficient [355 U.S. 41, 42] ground for dismissal of the suit, since the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. Pp. 47-48.

229 F.2d 436, reversed.

Joseph C. Waddy argued the cause for petitioners. With him on the brief were Roberson L. King, Robert L. Carter, William C. Gardner and William B. Bryant.

Edward J. Hickey, Jr. argued the cause for respondents. With him on the brief was Clarence M. Mulholland.

MR. JUSTICE BLACK delivered the opinion of the Court.

Once again Negro employees are here under the Railway Labor Act [1] that their collective bargaining agent be compelled to represent them fairly. In a series of cases beginning with Steele v. Louisville & Nashville R. Co., 323 U.S. 192 , this Court has emphatically and repeatedly ruled that an exclusive bargaining agent under the Railway Labor Act is obligated to represent all employees in the bargaining unit fairly and without discrimination because of race and has held that the courts have power to protect employees against such invidious discrimination. [2]

This class suit was brought in a Federal District Court in Texas by certain Negro members of the Brotherhood of Railway and Steamship Clerks, petitioners here, on behalf of themselves and other Negro employees similarly situated against the Brotherhood, its Local Union No. 28 and certain officers of both. In summary, the complaint [355 U.S. 41, 43] made the following allegations relevant to our decision: Petitioners were employees of the Texas and New Orleans Railroad at its Houston Freight House. Local 28 of the Brotherhood was the designated bargaining agent under the Railway Labor Act for the bargaining unit to which petitioners belonged. A contract existed between the Union and the Railroad which gave the employees in the bargaining unit certain protection from discharge and loss of seniority. In May 1954, the Railroad purported to abolish 45 jobs held by petitioners or other Negroes all of whom were either discharged or demoted. In truth the 45 jobs were not abolished at all but instead filled by whites as the Negroes were ousted, except for a few instances where Negroes were rehired to fill their old jobs but with loss of seniority. Despite repeated pleas by petitioners, the Union, acting according to plan, did nothing to protect them against these discriminatory discharges and refused to give them protection comparable to that given white employees. The complaint then went on to allege that the Union had failed in general to represent Negro employees equally and in good faith. It charged that such discrimination constituted a violation of petitioners' right under the Railway Labor Act to fair representation from their bargaining agent. And it concluded by asking for relief in the nature of declaratory judgment, injunction and damages.

The respondents appeared and moved to dismiss the complaint on several grounds: (1) the National Railroad Adjustment Board had exclusive jurisdiction over the controversy; (2) the Texas and New Orleans Railroad, which had not been joined, was an indispensable party defendant; and (3) the complaint failed to state a claim upon which relief could be given. The District Court granted the motion to dismiss holding that Congress had given the Adjustment Board exclusive jurisdiction over [355 U.S. 41, 44] the controversy. The Court of Appeals for the Fifth Circuit, apparently relying on the same ground, affirmed. 229 F.2d 436. Since the case raised an important question concerning the protection of employee rights under the Railway Labor Act we granted certiorari. 352 U.S. 818 .

We hold that it was error for the courts below to dismiss the complaint for lack of jurisdiction. They took the position that 3 First (i) of the Railway Labor Act conferred exclusive jurisdiction on the Adjustment Board because the case, in their view, involved the interpretation and application of the collective bargaining agreement. But 3 First (i) by its own terms applies only to "disputes between an employee or group of employees and a carrier or carriers." [3] ase involves no dispute between employee and employer but to the contrary is a suit by employees against the bargaining agent to enforce their statutory right not to be unfairly discriminated against by it in bargaining. [4] justment Board has no [355 U.S. 41, 45] power under 3 First (i) or any other provision of the Act to protect them from such discrimination. Furthermore, the contract between the Brotherhood and the Railroad will be, at most, only incidentally involved in resolving this controversy between petitioners and their bargaining agent.

Although the District Court did not pass on the other reasons advanced for dismissal of the complaint we think it timely and proper for us to consider them here. They have been briefed and argued by both parties and the respondents urge that the decision below be upheld, if necessary, on these other grounds.

As in the courts below, respondents contend that the Texas and New Orleans Railroad Company is an indispensable party which the petitioners have failed to join as a defendant. On the basis of the allegations made in the complaint and the relief demanded by petitioners we believe that contention is unjustifiable. We cannot see how the Railroad's rights or interests will be affected by this action to enforce the duty of the bargaining representative to represent petitioners fairly. This is not a suit, directly or indirectly, against the Railroad. No relief is asked from it and there is no prospect that any will or can be granted which will bind it. If an issue does develop which necessitates joining the Railroad either it or the respondents will then have an adequate opportunity to request joinder.

Turning to respondents' final ground, we hold that under the general principles laid down in the Steele, Graham, and Howard cases the complaint adequately set forth a claim upon which relief could be granted. In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts [355 U.S. 41, 46] in support of his claim which would entitle him to relief. [5] the complaint alleged, in part, that petitioners were discharged wrongfully by the Railroad and that the Union, acting according to plan, refused to protect their jobs as it did those of white employees or to help them with their grievances all because they were Negroes. If these allegations are proven there has been a manifest breach of the Union's statutory duty to represent fairly and without hostile discrimination all of the employees in the bargaining unit. This Court squarely held in Steele and subsequent cases that discrimination in representation because of race is prohibited by the Railway Labor Act. The bargaining representative's duty not to draw "irrelevant and invidious" [6] ctions among those it represents does not come to an abrupt end, as the respondents seem to contend, with the making of an agreement between union and employer. Collective bargaining is a continuing process. Among other things, it involves day-to-day adjustments in the contract and other working rules, resolution of new problems not covered by existing agreements, and the protection of employee rights already secured by contract. The bargaining representative can no more unfairly discriminate in carrying out these functions than it can in negotiating a collective agreement. [7] ract may be fair and impartial on its face yet administered in such a way, with the active or tacit consent of the union, as to be flagrantly discriminatory against some members of the bargaining unit. [355 U.S. 41, 47]

The respondents point to the fact that under the Railway Labor Act aggrieved employees can file their own grievances with the Adjustment Board or sue the employer for breach of contract. Granting this, it still furnishes no sanction for the Union's alleged discrimination in refusing to represent petitioners. The Railway Labor Act, in an attempt to aid collective action by employees, conferred great power and protection on the bargaining agent chosen by a majority of them. As individuals or small groups the employees cannot begin to possess the bargaining power of their representative in negotiating with the employer or in presenting their grievances to him. Nor may a minority choose another agent to bargain in their behalf. We need not pass on the Union's claim that it was not obliged to handle any grievances at all because we are clear that once it undertook to bargain or present grievances for some of the employees it represented it could not refuse to take similar action in good faith for other employees just because they were Negroes.

The respondents also argue that the complaint failed to set forth specific facts to support its general allegations of discrimination and that its dismissal is therefore proper. The decisive answer to this is that the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is "a short and plain statement of the claim" [8] ill give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. The illustrative forms appended to the Rules plainly demonstrate this. Such simplified "notice pleading" is made possible by the liberal opportunity for discovery and the other pretrial procedures [355 U.S. 41, 48] established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues. [9] ing the simple guide of Rule 8 (f) that "all pleadings shall be so construed as to do substantial justice," we have no doubt that petitioners' complaint adequately set forth a claim and gave the respondents fair notice of its basis. The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits. Cf. Maty v. Grasselli Chemical Co., 303 U.S. 197 .

The judgment is reversed and the cause is remanded to the District Court for further proceedings not inconsistent with this opinion.

It is so ordered.

# Footnotes

[ [Footnote 1] tat. 577, as amended, 45 U.S.C. 151 et seq.

[ [Footnote 2] tall v. Brotherhood of Locomotive Firemen & Enginemen, 323 U.S. 210 ; Graham v. Brotherhood of Locomotive Firemen & Enginemen, 338 U.S. 232 ; Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768 . Cf. Wallace Corp. v. Labor Board, 323 U.S. 248 ; Syres v. Oil Workers International Union, 350 U.S. 892 .

[ Footnote 3 ull, 3 First (i) reads:

"The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on the date of approval of this Act [June 21, 1934], shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes." 48 Stat. 1191, 45 U.S.C. 153 First (i).

[ Footnote 4 this reason the decision in Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239 , is not applicable here. The courts below also relied on Hayes v. Union Pacific R. Co., 184 F.2d 337, cert. denied, 340 U.S. 942 , but for the reasons set forth in the text we believe that case was decided incorrectly.

[ Footnote 5 e. g., Leimer v. State Mutual Life Assur. Co., 108 F.2d 302; Dioguardi v. Durning, 139 F.2d 774; Continental Collieries v. Shober, 130 F.2d 631.

[ Footnote 6 le v. Louisville & Nashville R. Co., 323 U.S. 192, 203 .

[ Footnote 7 Dillard v. Chesapeake & Ohio R. Co., 199 F.2d 948; Hughes Tool Co. v. Labor Board, 147 F.2d 69, 74.

[ Footnote 8 8 (a) (2).

[ Footnote 9 e. g., Rule 12 (e) (motion for a more definite statement); Rule 12 (f) (motion to strike portions of the pleading); Rule 12 (c) (motion for judgment on the pleadings); Rule 16 (pre-trial procedure and formulation of issues); Rules 26-37 (depositions and discovery); Rule 56 (motion for summary judgment); Rule 15 (right to amend). [355 U.S. 41, 49]  <

# Exhibit 2



U.S. Department of Justice

*United States Attorney*
*District of Montana*

WILLIAM W. MERCER
UNITED STATES ATTORNEY

*P.O. Box 1478*
*Billings, Montana 59103*

406/657-6101

# NEWS RELEASE

**FOR IMMEDIATE RELEASE**
**December 2, 2005**

Contact:  **William W. Mercer**
**United States Attorney for the**
**District of Montana**
**(406)247-4639**

### SANFORD WASSERMAN SENTENCED IN U.S. DISTRICT COURT

Bill Mercer, United States Attorney for the District of Montana, announced today that during a federal court session in Billings, on December 2, 2005, before U.S. District Judge Richard F. Cebull, SANFORD WASSERMAN, a 65-year-old resident of Lauderhill, Florida, appeared for sentencing.  WASSERMAN was sentenced to a term of:

- Prison: 5 years

- Special Assessment: $100

- Supervised Release: 3 years

WASSERMAN was sentenced in connection with his guilty plea to conspiring to distribute obscene materials.  WASSERMAN had a previous conviction for distribution of obscenity in the Southern District of Texas in 2001.

During 2001 and 2002, while doing business as "Pet Tec," WASSERMAN conspired to ship obscene videotapes throughout the United States in response to orders placed by customers who received mail order catalogs as part of the conspiracy.  The videotapes depicted violent "gang rapes" of women, sexual intercourse between humans and animals,

and other sexual activity which involved urination, defecation and sadistic and masochistic conduct.

The Supreme Court's decision in Miller v. California, 413 U.S. 15 (1973), stated that material which appeals to prurient sexual desire, is patently offensive, and contains no serious literary, artistic, political or scientific value falls outside the protection of the First Amendment right of free speech. The Miller Court also stated that the standard should be determined on a local, rather than national, community standard. An average person, applying local community standards, would find that the videotapes provided by WASSERMAN specifically appealed to prurient sexual desire, were patently offensive, and contained no literary, artistic, political or scientific value of any kind.

WASSERMAN reserved the right to appeal the sentence. Because there is no parole in the federal system, the "truth in sentencing" guidelines mandate that WASSERMAN will likely serve **all** of the time imposed by the court. In the federal system, WASSERMAN does have the opportunity to earn a sentence reduction for "good behavior." However, this reduction will not exceed 15% of the overall sentence.

U.S. Attorney Bill Mercer prosecuted this case in conjunction with Damon King of the Criminal Divisions Child Exploitation and Obscenity Section for the United States.

The investigation was conducted by the Northwest Division of the United States Postal Inspection Service in Billings and Seattle.

Mercer stated that this is the longest sentence ever imposed in and obscenity case. Co-defendant Thomas W. Lambert received a 30-month sentence earlier this year for the same crime. Gary Robinson of Billings received a twelve-month sentence for the distribution of obscenity in 2004.

# # # # #

# Exhibit 3



# Department of Justice

FOR IMMEDIATE RELEASE                                    CRM
MONDAY, MARCH 14, 2005                          (202) 514-2008
WWW.USDOJ.GOV                              TDD (202) 514-1888

## EDWARD WEDELSTEDT, OTHERS INDICTED ON OBSCENITY, RACKETEERING AND TAX CHARGES

WASHINGTON, D.C.   The Department of Justice, the Department of Homeland Security's U.S. Immigration and Customs Enforcement, and the Internal Revenue Service announced today that a federal grand jury in Dallas, Texas, has returned a 23-count indictment naming Edward Joseph Wedelstedt of Littleton, Colorado, six other individuals and Colorado-based Goalie Entertainment Holdings, Inc., on racketeering, obscenity and tax charges related to the operation of dozens of video arcades featuring pornographic materials across the United States.

Named in the indictment are: Wedelstedt; Goalie Entertainment Holdings, Inc.; Vivian Lee Schoug of Littleton, Colorado; Arthur Morris Boten of Des Moines, Iowa; James Randal Martinson of Memphis, Tennessee; Jeffrey Mark Parrish of Denver, Colorado; Leroy Moore, Sr. of Arlington, Texas; and Beverly Kay Van Dusen of Arlington, Texas.

The indictment charges racketeering, in violation of 18 U.S.C. 1962(c), conspiracy to engage in the business of selling and transferring obscene material, in violation of 18 U.S.C. 371, engaging in the business of selling and transferring obscene matter, in violation of 18 U.S.C. 1466, the interstate transportation and sale of obscene materials, in violation of 18 U.S.C. 1462 and 1465, and  conspiracy to defraud the United States in the ascertainment and collection of taxes, in violation of 18 U.S.C. 371.

The indictment alleges that Edward J. Wedelstedt, through his wholly owned corporation, Goalie Entertainment Holdings, Inc., owns numerous pornographic bookstores in 18 states.  It is alleged that these bookstores consist of a front room in which pornographic videos, magazines and sexually oriented products can be purchased, and a back room video arcade in which customers pay to view pornographic videotapes.  The indictment further alleges that Wedelstedt and Goalie Entertainment Holdings, Inc. contract with numerous owners of other pornographic bookstores to provide arcade services in exchange for a percentage of the revenue.  Wedelstedt, his company and co-defendants, it is alleged, have conducted a criminal enterprise with the principal aims of distributing obscenity and mailing fraudulent sales tax returns.  The indictment also charges that Wedelstedt, Schoug and Goalie Entertainment Holdings, Inc. conspired to defraud the United States by not reporting large sums of cash income from businesses they owned and operated.

Specifically named in the indictment are six videotapes and DVDs found by the grand jury to be obscene.  These videos and DVDs can be generally described as hard-core pornography with patently offensive depictions of adults performing sexual conduct.

"These charges allege that the defendants ran a criminal enterprise that pandered obscene materials throughout the United States," said Assistant Attorney General Christopher A. Wray of

- 2 -

the Criminal Division. "Effective use of law enforcement's full arsenal is essential to stop purveyors of obscenity from distributing their offensive and degrading material."

Richard B. Roper, United States Attorney for the Northern District of Texas, said, "This indictment is a result of excellent cooperation between federal, state, and local law enforcement. Federal prosecutors in Wasington, Dallas and Austin, along with prosecutors with the Dallas District Attorney's Office, teamed up to tackle a nationwide organization which, the indictment alleges, was devoted to the distribution of degrading obscene material."

"IRS Criminal Investigation aggressively investigates violations of the tax laws and other related federal crimes. We work with our partners in law enforcement to build stronger cases against individuals and corporations who choose to disobey the federal laws," stated Nancy J. Jardini, Chief, IRS Criminal Investigation. "The prosecutions of individuals who intentionally conceal income and evade taxes is a vital element in maintaining public confidence in our tax system."

"The investigation leading to today's indictment exemplifies a true team effort," said Marcy Forman, Director of Investigations for U.S. Immigration and Customs Enforcement. "Our coordinated pursuit and investigative expertise in money laundering, criminal interstate trafficking and tax fraud has uncovered the individuals who distributed obscene material while engaging in federal tax crimes related to their illicit profits."

Each count charging substantive obscenity violations, tax fraud and conspiracy carries a maximum penalty of five years in prison and a $250,000 fine. The racketeering count carries a maximum penalty of 20 years in prison and a fine of $250,000. The United States also seeks forfeiture of the assets related to the offenses pursuant to 18 U.S.C. 1467 and 1963.

The case is being prosecuted by Trial Attorneys Ben Vernia, Steve Grocki and Alexandra Gelber of the Child Exploitation and Obscenity Section, Criminal Division, Department of Justice; Assistant U.S. Attorney Linda Groves and Special Assistant U.S. Attorney Tim Gallagher, United States Attorney's Office for the Northern District of Texas; and Trial Attorney Bob Kemins of the Tax Division, Department of Justice. The case has also been assisted by the Asset Forfeiture and Money Laundering Section and the Organized Crime and Racketeering Section, Criminal Division, Department of Justice. The case was investigated by U.S. Immigration and Customs Enforcement and the IRS Criminal Division.

The charges contained in the indictment are merely allegations. All defendants are presumed innocent until and unless convicted in a court of law.

### ###

05-120

Exhibit 4



# Department of Justice

FOR IMMEDIATE RELEASE                                         CRM
WEDNESDAY, JUNE 28, 2005                              (202) 514-2008
WWW.USDOJ.GOV                                    TDD (202) 514-1888

## OPERATOR OF SEXUALLY ORIENTED BUSINESS
## PLEADS GUILTY TO FEDERAL OBSCENITY CHARGE

WASHINGTON, D.C. – Acting Assistant Attorney General John C. Richter of the Criminal Division and Richard B. Roper, U.S. Attorney for the Northern District of Texas, announced that Leroy Moore, Sr., of Arlington, Texas, has pleaded guilty to conspiracy to engage in the business of selling or transferring obscene matter.

Moore, 64, of Arlington, Texas, entered the plea this morning in federal court in Dallas, Texas, before U.S. District Judge Ed Kinkeade. Moore, the operator of four adult bookstores in Tarrant County, Texas, faces a maximum statutory sentence of five years in prison, a $250,000 fine and restitution. Sentencing is scheduled for Sept. 29, 2005.

Moore pleaded guilty to one count of a 23-count indictment, returned in March 2005 by a federal grand jury in Dallas, that charged Moore and other individuals, including Edward Joseph Wedelstedt, of Littleton, Colorado, and Colorado-based Goalie Entertainment Holdings, Inc., with racketeering, obscenity and tax charges. Moore pleaded guilty today to the only count in which he was charged in the indictment. Generally, the indictment charges criminal activities related to the operation of dozens of video arcades across the United States where customers can pay with tokens or coins to view clips of obscene videos or DVDs. Moore has agreed to cooperate with the government's prosecution in this case, and trial for the remaining defendants is set for January 2006.

Moore also pleaded guilty on June 22, 2005 to a separate indictment, filed in the Fort Worth, Texas, Division of the Northern District and unsealed in October 2004, charging him with conspiracy to evade federal taxes. Moore previously entered a guilty plea in yet another case in federal court in Fort Worth, Texas in which he was charged with being a felon in possession of a firearm, and is awaiting sentencing on that charge.

According to documents filed with the district court in Dallas, Moore managed and operated adult bookstores including the following businesses located in Tarrant County, Texas: Bright Lights I, Bright Lights II, Star Video and New Video. Each of Moore's stores contained a video arcade or "peep show," consisting of a dozen or more small, private booths containing video screens with channel controls and devices which accept coins or tokens. The video players permitted customers to view sexually explicit videos by placing money or tokens into a slot which activated the screen for a finite length of time, usually one minute or less. The customers could select from a variety of sexually explicit videos by pushing various channel buttons. Customer viewing time could be extended by inserting additional coins, currency or tokens. The adult bookstores and the video arcades operated 24 hours per day, seven days a week.

Moore has admitted that the six videos named in the indictment, which were displayed in his video arcades, are obscene. After reviewing the materials, Judge Kinkeade made a finding on

- 2 -

the record that none of the materials in question were constitutionally protected. These videos are described as depicting hard core sexual intercourse, including genital-genital, oral-genital, anal-genital, and oral-anal sexual contact between persons of the same or opposite sex, or lascivious simulated sexual intercourse where the genitals, breast, or pubic area of the performer was exhibited.

The case is being prosecuted by Trial Attorneys Steve Grocki and Alexandra Gelber of the Child Exploitation and Obscenity Section, Criminal Division, Department of Justice; Assistant U.S. Attorneys Linda Groves and Erin Nealy Cox and Special Assistant U.S. Attorney Tim Gallagher, United States Attorney's Office for the Northern District of Texas; and Trial Attorney Bob Kemins of the Tax Division, Department of Justice. Assistance was also provided by the Organized Crime and Racketeering Section and the Asset Forfeiture and Money Laundering Section, both part of the Criminal Division of the Department of Justice.

The RICO-obscenity investigation was spearheaded by U.S. Immigration and Customs Enforcement, and the tax evasion investigation was handled by the Criminal Investigations Division of the Internal Revenue Service. Investigative assistance was also provided by several police departments and prosecutors' investigators from several states, including the Dallas District Attorney's Office.

# # #

05-XXX

Exhibit 5

 **Department of Justice**

FOR IMMEDIATE RELEASE                                                                                  CRM
FRIDAY, NOVEMBER 4, 2005                                                               (202) 514-2008
WWW.USDOJ.GOV                                                                    TDD (202) 514-1888

### NATIONAL OPERATOR OF SEXUALLY ORIENTED BUSINESS
### PLEADS GUILTY TO FEDERAL OBSCENITY AND TAX CHARGES

WASHINGTON, D.C. -- The Department of Justice, the Department of Homeland Security's U.S. Immigration and Customs Enforcement, and the Internal Revenue Service announced that Edward J. Wedelstedt, of Littleton, Colorado, pled guilty this morning in federal court in Dallas, Texas, before the Honorable Paul Stickney, United States Magistrate Judge, to transporting obscene matters for sale or distribution, in violation of 18 U.S.C. § 1465, and engaging in a conspiracy to defraud the United States by frustrating, impeding, or hindering the Internal Revenue Service (IRS) of the Treasury Department, in violation of 18 U.S.C. § 371. Wedelstedt's plea, if accepted by the Court, will result in a 13-month prison sentence to be followed by one year of supervised release. Wedelstedt will also face forfeiture of businesses and property located in Texas. Further, Wedelstedt has already forfeited $1.25 million to the U.S. government in connection with this investigation. The sentencing date is scheduled for February 9, 2006.

Alice S. Fisher, Assistant Attorney General of the Criminal Division of the Department of Justice said, "The Department of Justice, with other law enforcement agencies, will pursue those, like Edward Wedelstedt, who transport adult obscene material in violation of our criminal laws with all available tools. This will include jail time, tax penalties, and forfeiture of business interests where those businesses engage in the distribution of obscene material. This guilty plea is a warning to others who are pandering such hard-core pornography that the Department of Justice will bring to justice those who violate our Nation's obscenity laws."

The indictment in this case addressed the criminal activities of Wedelstedt and his wholly owned, multi-million dollar corporation called Goalie Entertainment Holdings, Inc. (GEH), related to the operation of adult pornography bookstores with video arcades throughout the country where customers could pay to view clips of obscene videos or DVDs. Among the video arcades operated by GEH and its subsidiary Goalie Entertainment were arcades in Abilene, Amarillo, Merkel, Terrell, Hillsboro, Wichita Falls, Lubbock, and Dallas, Texas.

Richard B. Roper, United States Attorney for the Northern District of Texas, said "Mr. Wedelstedt is the self-proclaimed largest distributor of pornography in the United States. Tough law enforcement and aggressive prosecution have dismantled Mr. Wedelstedt's organization throughout the State of Texas. Today's guilty plea clearly shows that federal and state law enforcement will vigorously enforce federal laws against individuals that distribute obscene and degrading material in our communities."

Alonzo Pena, Special Agent-in-Charge, U.S. Immigrations and Customs Enforcement in San Antonio said, "The investigation leading to today's guilty plea exemplifies a true team effort among many law enforcement agencies. Our coordinated pursuit and investigative expertise in criminal interstate trafficking and tax fraud uncovered the individuals who distributed obscene material while engaging in federal tax crimes related to their illicit profits."

According to documents filed with the District Court in Dallas, Wedelstedt has managed and operated the following pornographic bookstores and adult video arcades in Tarrant County, Dallas County, and elsewhere in the Northern District of Texas: Bright Lights I, Bright Lights II, Star Video, New Video, Eros Books, Regal Video Stop, Scooters, Adult Etc. I, Adult Etc. II, Adult Etc. IV, and Adult Etc. V. Wedelstedt's stores, both in Texas and throughout the country, contain a video arcade or "peep show," consisting of a dozen or more small, private booths containing video screens with channel controls and devices which accept coins or tokens. The video players permit customers to view sexually explicit videos by placing money or tokens into a slot which activates the screen for a finite length of time, usually one minute or less. The customers can select from a variety of sexually explicit videos by pushing various channel buttons. Customer viewing time can be extended by inserting additional coins, currency or tokens. The adult pornography bookstores and the video arcades typically operate 24 hours per day, seven days a week.

By his plea, Wedelstedt has admitted that he distributed one of the videos named in the indictment to his stores in Texas, and that the video was obscene as judged by community standards in the Northern District of Texas. The video can generally be described as depicting hard core pornography with patently offensive depictions of adults performing sexual conduct. The video was shipped from another Wedelstedt company located in California through a common carrier.

Wedelstedt further admitted that he conspired with certain arcade managers within his company to have large amounts of cash generated from his company's arcade operations provided directly to him, giving him absolute control over the funds. Wedelstedt collected these large amounts of cash and transported it back to his headquarters in Denver, Colorado. Wedelstedt directed his arcade managers to supply him with weekly summary sheets, along with the currency, that detailed the total amount of arcade revenue being provided to him personally. These weekly summary sheets, the only written record of the amount collected by Wedelstedt, were not retained by GEH. From these cash funds, Wedelstedt frequently paid cash salaries and cash bonuses to employees and other parties without reporting the payments to the company accounting or payroll departments, with the agreement between Wedelstedt and the recipients of the cash that the payments would not be reported to the IRS. These actions resulted in a tax loss to the government of hundreds of thousands of dollars.

Pursuant to the terms of the plea agreement filed with the court, Wedelstedt will terminate all current sexually oriented business activities in the State of Texas, and will forfeit all business property located in the state. Further, Wedelstedt will cease all sexually oriented business operations in the state during his terms of sentence and supervised release.

Wedelstedt was indicted on March 11, 2005, along with six individual defendants and GEH. One of the defendants, Leroy Moore, Sr., a former business associate of Wedelstedt, pled guilty in June to one count of conspiracy to distribute obscenity, the sole count he faced in the indictment. Moore will be sentenced at a later date.

Nancy J. Jardini, Chief of Criminal Investigations, Internal Revenue Service said, "All income is taxable - legitimate income as well as the proceeds of fraudulent activity. Failure to pay taxes impacts every law abiding, taxpaying citizen. When law enforcement agencies combine resources and expertise, we create a formidable force-the result of which you see today."

The case is being prosecuted by Trial Attorneys Steve Grocki and Alexandra Gelber of the Child Exploitation and Obscenity Section, Criminal Division, Department of Justice; Assistant U.S. Attorneys Linda Groves and Erin Nealy Cox of the United States Attorneys' Office for the Northern District of Texas; Dallas County Assistant District Attorney Tim Gallagher who was deputized as a Special Assistant U.S. Attorney for the investigation; and Trial Attorney Robert Kemins of the Tax Division, Department of Justice. Assistance was also provided by the Organized Crime and Racketeering Section and the Asset Forfeiture and Money Laundering Section, both part of the Criminal Division of the Department of Justice.

The obscenity investigation was spearheaded by U.S. Immigration and Customs Enforcement, and the tax evasion investigation was handled by the Criminal Investigations Division of the Internal Revenue Service. Investigative assistance was also provided by several police departments and prosecutors' investigators from several states, including the Dallas District Attorney's Office.

# #

05-594

# Exhibit 6



# Department of Justice

FOR IMMEDIATE RELEASE                                           CRM
TUESDAY, NOVEMBER 16, 2004                          (202) 514-2008
WWW.USDOJ.GOV                                      TDD (202) 514-1888

## OHIO COUPLE SENTENCED TO PRISON ON OBSCENITY CHARGES

WASHINGTON, D.C. – Assistant Attorney General Christopher A. Wray of the Criminal Division, U.S. Attorney Gregory A. White of the Northern District of Ohio and Guy Cottrell Acting Inspector in Charge, Pittsburgh Division, U.S. Postal Inspection Service, announced today that an Ohio couple, Ronald and Alina Urbassik, have been sentenced to prison on charges of mailing and transporting obscene material.

Judge Paul R. Matia of the U.S. District Court in the Northern District of Ohio sentenced Ronald Urbassik to 12 months and one day in prison, along with a $3,000 fine. Alina Urbassik was sentenced to 4 months in prison. The couple pleaded guilty in July 2004 to a seven-count indictment that had been returned against them on April 13, 2004. The Urbassiks pleaded guilty to conspiring to engage in the business of selling or transferring obscene matter in violation of Title 18 USC Sections 371 and 1466; mailing obscene matter, in violation of Title 18 USC Sections 1461 and 2; and engaging in the business of selling or transferring obscene matter, in violation of Title 18 USC Section 1466. In addition to the prison sentence, the judge ordered the couple to forfeit the contraband that was the subject of the indictment.

Since 1990, the defendants have operated a catalog business that offered for sale hundreds of videotapes and DVDs depicting obscene matter, including sexually explicit conduct involving sado-masochism, defecation, urination and bestiality. The defendants distributed these obscene matters using the U.S. Mail.

This case was prosecuted by Trial Attorney Kayla Bakshi of the Department of Justice Child Exploitation and Obscenity Section and Assistant U.S. Attorneys Michael A. Sullivan and Christian H. Stickan of the Criminal Division of the U.S. Attorney's Office for the Northern District of Ohio. The case was investigated by the Cleveland Office of the United States Postal Inspection Service.

Today's sentencing is the second this week related to federal obscenity charges. Yesterday, a federal judge in Charleston, West Virginia, sentenced Harold Foote Hoffman, of Nitro, West Virginia in connection with his guilty plea to charges of using the U.S. Mail for the delivery of obscene matter, which included depictions of sexual acts involving defecation and bestiality. Hoffman was sentenced to 18 months imprisonment. He was prosecuted by Trial Attorney Paul Almanza of the Department of Justice Child Exploitation and Obscenity Section and Assistant U.S. Attorney Larry Ellis of the U.S. Attorney's Office for the Southern District of West Virginia. The case was investigated by the Charleston, West Virginia Office of the United States Postal Inspection Service.

# # #

04-748